202 F.Supp.2d 345 (2002)
M.A., a minor child, by his parents, G.A. and E.A., Plaintiff,
v.
VOORHEES TOWNSHIP BOARD OF EDUCATION, Defendant.
Civil No. 01-2595(JBS).
United States District Court, D. New Jersey.
May 29, 2002.
*346 *347 Herbert D. Hinkle, Esquire, Law Offices of Herbert D. Hinkle, Lawrenceville, NJ, for Plaintiff.
Howard S. Mendelson, Esquire, Davis & Mendelson, LLC, Cherry Hill, NJ, for Defendant.

OPINION
SIMANDLE, District Judge.

 TABLE OF CONTENTS
 I. PROCEDURAL HISTORY .......................................................348
 II. FACTUAL BACKGROUND .......................................................350
 A. Fran Collins ..........................................................351
 B. Dr. Anita Breslin .....................................................351
 C. Jeff Giancaterino .....................................................352
 D. Rebecca Null ..........................................................352
 E. Ali DeGeorge ..........................................................353
 F. Catherine Cook ........................................................354
 G. Dr. David Holmes ......................................................355
 H. G.A....................................................................357
 I. E.A. ..................................................................358
 J. Raymond Brossel........................................................358
III. DISCUSSION ...............................................................358
 A. Plaintiff's Motion and Defendant's Cross-Motion for Summary Judgment ..358
 1. Standard of Review .................................................359
 B. Analysis: The 2000-01 IEP .............................................359
 1. Individuals with Disabilities Education Act ("IDEA") ...............360
 2. Free Appropriate Public Education ("FAPE") .........................361
 3. Least Restrictive Environment ......................................364
 a) Mainstreaming in a "Regular" Classroom ..........................365
 b) Ability to Receive Educational Benefit ..........................357

*348
 c) Effect M.A. Would Have on Others ................................368
 4. Recommended Placements .............................................369
 IV. CONCLUSION ...............................................................369

Plaintiff M.A. brought this action through his parents, G.A. and E.A.,[1] against defendant Voorhees Township Board of Education ("Voorhees"), under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), as an appeal from the final administrative decision of the Honorable Bernard Goldberg, New Jersey Administrative Law Judge ("ALJ"), issued on May 1, 2001. Plaintiffs assert that the education M.A. is currently receiving at Osage Elementary ("Osage"), his neighborhood public school in Voorhees, is appropriate and sufficient, and that the 2000-2001 Individualized Education Plan ("IEP") created for M.A. and the decision of the ALJ below, which called for M.A., an autistic child, to be instructed at an out-of-district placement with a program for autistic children in order to obtain a free and appropriate public education ("FAPE") in the least restrictive environment ("LRE") were inappropriate.[2] Plaintiff asserts that the Osage educational program, with some adjustments, is appropriate and the least restrictive option, and that the IEP is flawed because it fails to identify a specific out-of-district placement for M.A. Defendant asserts that it is incapable of providing M.A. with a FAPE in the LRE at Osage, despite its best efforts to do so, and that G.A. and E.A. are responsible for the failure to designate an out-of-district placement.
Presently before the Court are plaintiffs' motion and defendant's cross-motion for summary judgment. Plaintiff seeks to have the ALJ decision reversed and an order directing Voorhees to continue providing M.A. with a FAPE in district at Osage with certain program enhancements, as recommended by plaintiff's expert witness. Defendant seeks to have the ALJ decision affirmed and have M.A. placed in an out-of-district day program. Defendant also seeks a court directive instructing G.A. and E.A. to cooperate in the application and selection process for an out-of-district school.[3] For the reasons stated herein, plaintiff's motion for summary judgment will be denied, and defendant's cross-motion for summary judgment will be granted, and the ALJ decision will be affirmed. M.A. shall be placed in an out-of-district program at Eden, Bancroft, or Sawtelle-Collingswood, whichever is first available. G.A. and E.A. are directed to cooperate with the application process.

I. PROCEDURAL HISTORY

Plaintiff M.A., who is severely autistic, was born on August 10, 1989 and is presently *349 twelve years old. M.A. has attended Osage in the Voorhees Public School District since he was nine years old, where he has received in school and at home consulting services from Bancroft Programs and Douglass Outreach Programs. In or about the Spring of 2000, M.A.'s Child Study Team ("CST"), comprised of G.A., E.A., several teachers, and a consultant, attempted to create a feasible IEP to address M.A.'s needs and disability. On June 20, 2000, an IEP was created for M.A., calling for placement at an out-of-district school with a program for autistic children, but leaving the specific out-of-district placement school "to be determined." (See App. at 490, hereinafter the "2000-01 IEP"). M.A.'s parents, G.A. and E.A., rejected the 2000-01 IEP and reiterated their desire for M.A. to remain in an inclusion program at Osage.
On August 11, 2000, after no agreement could be reached about M.A.'s IEP, Voorhees filed a petition for hearing pursuant to N.J.A.C. 6A:14-2.7, seeking to compel placement of M.A. in an out-of-district school for the 2000-01 school year. (App. at 1.) On August 22, 2000, the parties reached a partial mediation agreement and G.A. and E.A. agreed to release M.A.'s records to the Eden School ("Eden") and to the Bankbridge School in Gloucester County ("Gloucester"). (See App. at 3-4.) According to M.A.'s parents, Eden had no openings at that time and also Gloucester was inappropriate. (See 7 Tr. 182-85.) On September 8, 2000, Voorhees sought emergent relief and an Order directing that M.A.'s records be released to Gloucester and that M.A. be placed there pursuant to the IEP. (See App. at 5-6.) Voorhees also sought to have M.A.'s home schooling period extended until an appropriate out-of-district placement was found.
On September 15, 2000, plaintiff and his parents made application for emergent relief and a "stay-put" order to keep M.A. at Osage pursuant to 20 U.S.C. § 1415(j) and 6A:14-2.7(o). On September 29, 2000, after a hearing, the Honorable Bernard Goldberg, Administrative Law Judge, authorized the release of M.A.'s records to four additional schools, Burlington County Special Schools District ("Burlington"), Durand School ("Durand"), Bancroft School ("Bancroft"), and Yale School ("Yale"). (App. at 18-21.) On October 5, 2000, Judge Goldberg ordered that M.A. should remain in his at home placement until October 22, 2000, and that G.A. and E.A. should visit Burlington and Durand to determine whether either was appropriate for M.A. (App. at 22-23.) On October 23, 2000, after no appropriate out-of-district placement could be identified, M.A. returned to Osage to be educated in a self-contained classroom with inclusion during lunch, recess, art, and physical education. Voorhees renewed its request for placement of M.A. in an out-of-district program.
On May 1, 2001, Judge Goldberg issued his final decision after receiving nine days[4] of testimony and evidence. (See 1-9-T.) Seven witnesses testified on behalf of defendant Voorhees[5] and three on behalf of *350 plaintiff.[6] Judge Goldberg made numerous findings in his opinion, including that M.A.'s aggressive behavior adversely affects his education, that M.A. is socially unengaged, that M.A.'s educational goals are largely unfulfilled, and that M.A. needs a specialized educational program which cannot be made to work at Osage. (See App. 29-54, May 2001 ALJ Decision, at 46-47.) Judge Goldberg also found that M.A. cannot be included in any mainstream class at Osage and that the Sawtelle School in Collingswood offers a day program for autistic children. (See id. at 47.) Judge Goldberg finally found that although implementing Dr. Holmes's suggestions could perhaps provide an appropriate education at Osage, such a result is unlikely based on the record. (See id.) Judge Goldberg noted M.A.'s parents' opposition to having M.A. placed anywhere outside of Osage and also G.A.'s refusal of his expert's offer of a placement at Eden for the extended 2001 school year. (See id. at 47-49.)
Judge Goldberg concluded that the record indicated that M.A. required placement in an out-of-district school for autistic children in order to receive an appropriate education. (Id. at 49.) Judge Goldberg further concluded that Eden was an appropriate placement for M.A. in its 2001 extended school year program and ordered placement of M.A. at Eden for the 2001 extended school year. (Id.) Judge Goldman finally concluded that Eden, Sawtelle, Bancroft, and Gloucester also had programs for autistic children and ordered M.A. to be placed in one of those four placements for the 2001-2002 school year. (Id.) Judge Goldman retained jurisdiction over implementation issues. (Id. at 50.)
On May 31, 2001, the instant Complaint was filed by M.A. On December 11, 2001, plaintiff filed a motion for summary judgment on his Complaint. Also on December 11, 2001, defendant filed a cross-motion for summary judgment. On January 31, 2002, a consent order was filed withdrawing certain damages claims. Pursuant to the stay put order, M.A. has remained at Osage since October, 2000.

II. FACTUAL BACKGROUND

The ALJ heard testimony from ten witnesses, including two experts, and the administrative record before this Court contains nine volumes of their testimony, in addition to over 800 pages of documents entered into evidence and relating to M.A.'s education.[7] Plaintiffs G.A. and E.A. cite their own testimony and portions of the testimony of their expert, Dr. Holmes, in support of their argument that M.A. made real progress during the 2000-01 school year because Rebecca Null, who they believed was an ineffective teacher, was replaced by Jeff Giancaterino. Therefore, they assert, since Giancaterino arrived, M.A. has been obtaining a "meaningful educational benefit" at Osage. Defendants cite the testimony of teachers, professionals, and administrators at Osage, in addition to the testimony of their expert Dr. Breslin, in support of their position that M.A. is gaining little educational *351 benefit and no social benefit at Osage. Defendants therefore assert that they are unable to provide M.A. with a FAPE in the LRE in-district at Osage and ask the Court to affirm the ruling of the ALJ. Payment for the private, out-of-district placement is not an issue in this case.

A. Fran Collins

The first witness before the ALJ was Fran Collins, Director of Special Services at Voorhees, on behalf of defendant. (See 3T16-148 and 9T169:22-176:16; App. 31-33.) The ALJ found that Ms. Collins acknowledged that M.A. demonstrated aggressive behavior problems during the 1999-2000 school year. (App. at 32.) M.A.'s aggressive behaviors were addressed by reducing expectations and demands for M.A., which improved the behavior problems but caused some educational regression. (Id.) Ms. Collins further testified that a more intrusive behavioral modification plan than the one in place for M.A., developed by the Douglass Consultants, was rejected by G.A. and E.A. (Id.) Ms. Collins testified that she felt it was inappropriate to implement the additional behavioral modification restraints contemplated by Dr. Holmes in a public school setting. (Id.; 3T 82:24-84:5.) Further, Ms. Collins indicated that although M.A.'s aggressive behaviors had decreased with the decreased demands, M.A. had regressed educationally, demonstrated by his rote learning and a general lack of progress in the development of skills. (3T 53:4-54:22.)

B. Dr. Anita Breslin

The second witness before the ALJ was defense expert Dr. Anita Breslin. (See 4T5-115; App. 33-36.) In her experience as an expert witness in this type of case, Dr. Breslin has never before testified as an independent expert at the request of a school board; her approximate 100 past experiences have been as an expert on behalf of the child. (4T 11:20-12:4.) Dr. Breslin's two reports, from May, 2000 and December, 2000, are also a part of the administrative record. (See App. 519-591.) The ALJ noted that Dr. Breslin evaluated M.A. and his educational program and also interviewed teachers and consultants while observing him in his program at Osage in May and December, 2000. (App. at 33.) Additionally, the ALJ noted that Dr. Breslin observed no significant learning, an inability to maintain skills, and no interaction with his peers. (Id.) During her observation, Dr. Breslin noted that M.A.'s vocalization increased from May to December, but that his overall progress was marginal and not meaningful and also that he was unable to generalize isolated skills. (Id. at 34.) Dr. Breslin concluded that M.A.'s educational program could not be made to work at Osage and testified that he needed a comprehensive educational program implemented by in-house specialists. (Id.)
Dr. Breslin expressed real concern about M.A.'s aggressions and potentially self-harmful (pica) behavior. (App. at 34; App. 532, May, 2000 Expert Report.) During her observation of M.A. in May, 2000, Dr. Breslin noted a disturbing intensity of aggressive behaviors against peers and adults, sometimes prompted by demand situations and other times seemingly unprompted, unprovoked, and compulsive in nature. (App. 532-33; 4T 26:12-25.) Dr. Breslin also noted that staff were repeatedly injured by M.A., and required antibiotic ointment for infections. (Id.; App. 661-85, Photographs of staff injuries.) With respect to the more intrusive restraints referenced by Dr. Holmes, discussed below, Dr. Breslin indicated to the ALJ that such methods are not generally employed in a public school setting. Elopements *352 are also a problem, as observed by Dr. Breslin (App. at 536-37), and as reported by his home behaviorist Marjorie Horenstein, B.S., who indicated that M.A. had to be "watch[ed] like a hawk" because he was "fast and impulsive." (App. at 533.)
Additionally, Dr. Breslin opined that M.A.'s placement at Osage is not the Least Restrictive Alternative for him. (App.535, 549.) Dr. Breslin testified that M.A. has minimal, nonmeaningful inclusion with his peers, and is educated in an almost entirely self-contained program within the traditional elementary school setting. (App.35-36, App.535-36.) M.A. also demonstrates an aversion to social interaction. (App. at 34-36; 4T 25:1-26:1.)
On cross-examination, Dr. Breslin indicated that she did not conduct a home visit because she perceived G.A. and E.A. to be hostile and felt that such an observation would not be productive. (5T 15:18-17:6.) Dr. Breslin, however, clearly stated that "Mr. and Mrs. A[] are caring and concerned parents who continue to remain proactively involved in securing appropriate educational and related services for their son." (App.537.) After her observational school visit in December, Dr. Breslin determined that M.A. had fewer aggressions, but reiterated her determination that M.A.'s placement at Osage was not appropriate and offered no opportunity for learning. (App.35, 535-36.)
In conclusion, Dr. Breslin opined that M.A.'s current placement at Osage was "highly restrictive" and that he requires an instructional setting that uses a systematic data-based approach to improve skills, communication, and interaction while still keeping M.A.'s excessive behaviors under control. (App.536, 549.) Dr. Breslin further opined that if M.A.'s aggressive behaviors can be further reduced and if he is placed in an appropriate, highly specialized out-of-district setting, M.A. can make the meaningful progress that is crucial to his development as a severely impaired young man with autism. (App.536-37.) Dr. Breslin concluded that, despite the best efforts of the school district to develop an appropriate program for M.A., the nature and extent of his disabilities require more than can be implemented in a public school setting. (App.549.)

C. Jeff Giancaterino

The third witness before the ALJ was M.A.'s teacher since the fall of 2000, Jeff Giancaterino. (App. 37-38; 5T 123-6T 75.) Mr. Giancaterino advised the ALJ that while M.A.'s behavioral controls had improved from the 1999-2000 school year, the frequency of aggressions was still significant. (App.37-38.) Giancaterino acknowledged on cross-examination that a good amount of the comments in M.A.'s daily reports were positive. (6T 51:2-23.) Giancaterino reported that M.A.'s behavior is unpredictable, that he has been injured on numerous occasions by M.A., and also that M.A.'s frequent elopements are dangerous to the child. (5T 146-161, 169-170; App. 661-685, photos of injuries; App. 37-38.) Mr. Giancaterino further indicated that he has never worked with a child as severely autistic as M.A. in a public school. (6T 65:5-11; App. 37-38.) Giancaterino advised the ALJ that M.A. had mastered only 3 of the 35 objectives in his IEP and also that M.A. does not maintain eye contact and often loses skills previously mastered. (App.37.) Mr. Giancaterino concluded that he felt M.A.'s placement at Osage was not proper. (5T 204:19-22; App. 38.)
Plaintiffs, who feel that Giancaterino is a better teacher than Rebecca Null and seek to have M.A. remain under the tutelage of Giancaterino, argue that his testimony about M.A.'s progress is colored by his status as a "young man who has only just *353 started teaching" and also that "[i]t is not surprising that he ... would side with his employer." (Pl.'s Br. at 15.) These conclusory statements about Giancaterino's testimony are not supported in the record. Additionally, the ALJ rejected plaintiffs' counsel's theory and credited Giancaterino's testimony after hearing all the questioning. (App.39.) This Court also rejects the theory that Giancaterino's testimony was given solely to please his employer. He is, to all appearances, a dedicated educator who has the best interests of M.A. at heart. Additionally, Mr. Giancaterino's testimony indicates that he is capable of making independent decisions in difficult situations. Giancaterino testified that Mr. A requested that he and the assistant reduce the number of negative comments about M.A. during his interaction with non-disabled children. (6T 63:10-15.) Also, Giancaterino advised the ALJ that there was no behavioral plan in place at Osage. (6T 72:23-24; App. 38.) Mr. Giancaterino again concluded that he felt M.A.'s placement at Osage was not proper. (5T 204:19-22; App. 38.)

D. Rebecca Null

The fourth witness to testify before the ALJ was Rebecca Null, M.A.'s teacher during the 1999-2000 school year. (App. 36-37; 6T 75-159.) Ms. Null has a B.S. degree in speech/language therapy from Purdue University, a masters degree in education from Beaver College, and is currently working towards her Ph. D. in educational psychology and special education at Temple University. (6T 76:5-17.) Prior to her time at Osage, Ms. Null worked at Durand Academy for two years and also provided respite care and shadow teaching to autistic children. (6T 76:18-77:5.) Null testified that although M.A. made some progress in the program at Osage, his level of functioning did not improve and he did not become more independent. (App.36.) Null reported that although M.A. was able to spell certain words and identify certain objects, he did not know the meaning of the words and could not generalize information. (6T 86:14-88:11.) Ms. Null testified that M.A. needed more than the program he was receiving at Osage, which she concluded provided "isolated splinter skills," and recommended a program that promoted generalization of learning and functional skills. (6T 95:22-96:22.)
Ms. Null also testified about M.A.'s aggressions, which she said were not able to be controlled with the level of intervention available at Osage. (App.36.) Ms. Null testified that M.A. aggressed against other students on multiple occasions, and that one child cried every time she saw M.A. (6T 96:23-103:8.) Null concurred that elopement was also a problem that was dangerous to M.A. (6T 103:10-104:3.) Ms. Null noted that M.A.'s inclusion time with non-disabled children was reduced after the 1999-2000 school year, primarily because of his aggressions toward other students and staff. (6T 94:17-95:12.)
Ms. Null concluded that M.A.'s education at Osage was not appropriate for him. (6T 92:4-94:1.) Ms. Null, after reviewing the expert reports of Dr. Breslin, concurred that M.A.'s program was not appropriate because he requires level 3 behavioral interventions (physical restraints), which are not used in public schools. (6T 94:3-14.)

E. Ali DeGeorge

The fifth witness to testify before the ALJ was Alexandra (Ali) DeGeorge, the program coordinator for Douglass College Outreach and M.A.'s on-site program coordinator at Osage. (App. 38-40; 6T 161-7T 46.) DeGeorge began working with the Douglass Developmental Disability Center in 1996 and, upon her graduation from *354 college, began working with Douglass Outreach, working at home programs and shadowing in school districts in the area. (6T 162:10-164:22.) DeGeorge had also provided consulting services throughout New Jersey and New York. (6T 163:16-168:2.)
Ms. DeGeorge testified that she has never seen a child as developmentally disabled as M.A. being educated in a public school. (6T 168:18-22.) Ms. DeGeorge testified that in her experience as a consultant in schools all over New Jersey, level three restraints were never used in public schools. (6T 168:3-17.) DeGeorge agreed with Dr. Breslin's conclusions and indicated that it was not even a close call to determine that M.A. requires an out-of-district placement. (6T 168:23-169:18.) DeGeorge indicated that she had personally worked with M.A. at Osage for a year and a half without seeing any real progress. (6T 169:18-23.) DeGeorge testified that a specialized out-of-district placement, such as Douglass, could benefit M.A. since they have more highly specialized facilities and staff. (6T 166:4-15.)
DeGeorge conceded that M.A.'s aggressive behaviors had decreased since the 1999-2000 school year and also that he did not receive his home program until January 2001. (App.39.) DeGeorge, however, indicated that M.A. still demonstrated significant aggressions and elopements. (App.39-40.) DeGeorge acknowledged that objectives, such as those in P 9 and asked about by plaintiffs' counsel, can be implemented wherever there are proper materials and staff, but indicated that the program at Osage is "an imitation of what can be done better at an out-of district specialized school" and also that "we've lost a lot of time with M. in these past few years and we need to start moving with some of his more functional curriculum." (7T 8:8-9:1.) DeGeorge concluded that the program at Osage, even with the benefit of Douglass consulting, cannot provide M. with meaningful educational benefit (7T 9:2-5) or any social benefit (7T 9:6-22).
Plaintiffs, just as they did with Mr. Giancaterino, attempt to discount Ms. De George's testimony and experience by referring to her as a "young graduate student who works part-time" and surmising that she is eager to please her "employer," meaning Voorhees. (Pl.'s Br. at 12.) Plaintiffs' unsupported conclusions about Ms. DeGeorge in this area are incorrect. Ms. DeGeorge works for Douglass Outreach, not defendant Voorhees. Indeed, Ms. DeGeorge has a wide breadth of experience in New Jersey and New York, and plaintiffs' attempts to disparage her were rejected by the ALJ. (App.40.) Similarly, her observations and conclusions will be given weight by this Court.
Plaintiff's brief also refers to admissions and concessions by witnesses not actually present when read in the proper context. For example, plaintiffs argue that "When confronted with these (consultation/progress) reports, DeGeorge indicated that there is nothing in them to support her testimony that M[]'s program or that his placement is inappropriate." (Pl.'s Br. at 14, citing R-4, App. 222-42.) What DeGeorge actually acknowledged was that the reports were generally positive (6T 246:7-9) and also that the positive comments were directed at the staff because she is "always emotionally supportive of [her] staff working with children ...." (6T 269:1-13.) Plaintiffs' point, that if things were so bad DeGeorge should have indicated that in her reports, is noted by the Court.

F. Catherine Cook

The sixth witness to testify before the ALJ was Catherine Cook, a school social worker at Voorhees and the case manager *355 for M.A.'s CST. (App. 40-41; 7T 47-116.) Ms. Cook testified primarily about the behavioral intervention plan in place for M.A. at Osage, and also about appropriate out-of-district placements for M.A. (App.40-41.) Ms. Cook testified that she provided Mr. and Mrs. A with a copy of the 2000-2001 IEP and requested that they cooperate with Voorhees in finding an appropriate out-of-district placement for M.A. (7T 50:5-25.) Ms. Cook indicated that the A's were not cooperative in finding an out-of-district placement for M.A.'s 2000-01 IEP, and a court order had to be entered for the release of M's records to several placements. (7T 51:1-16.)
Ms. Cook testified about several out-of-district placements for autistic children, specifically, the Sawtelle School, which was opening a school in Collingswood, N.J., in addition to its established school in Montclair, New Jersey. (App.40.) The Sawtelle program is for autistic children only and has an experienced staff and comprehensive physical plant. (Id. at 40-41.) Dr. James Ball, formerly of Eden, is the school's director. (Id.)

G. Dr. David Holmes

The seventh witness[8] to testify before the ALJ was plaintiffs's expert in the field of autism, Dr. David Holmes, Executive Director of the Eden Institute. (App. 41-44; 8T4-235.) Dr. Holmes's two reports, from May, 2000 and December, 2000, are a part of the administrative record. (App. 351-76.) The ALJ noted that Dr. Holmes observed M.A. in his program at Osage on March 7, 2000 and also interviewed his teachers and aides. (App.41, App.369) The ALJ considered Dr. Holmes's notation of M.A.'s high degree of aggressive behavior (pinching, biting, scratching, and kicking) in response to demands that were placed upon him by teachers during the 1999-2000 school year. (Id.) Additionally, Dr. Holmes noted that M.A. was losing skills during that year. (Id.)
Dr. Holmes's May 31, 2000 report summarized his findings and recommendations regarding M.A.'s education at Osage. (App.367-376.) Dr. Holmes determined that because demands upon M.A. were what prompted him to aggress at school, demands were often reduced or eliminated by staff. (App.370.) Dr. Holmes reported that while this conduct reduced M.A.'s aggressions, it also reduced his productive educational activity. (Id.) This is not a revelation. Dr. Holmes also observed M.A. at home. Dr. Holmes observed that M.A., and not his instructor or parents, determined when he would engage, and that for the greater part of the observation M.A. wandered without purpose through the house or lounging on a chair. (App.370.) When an attempt to engage M.A. was made, he would walk or run in the other direction. (Id.)
During a March 21, 2000 meeting with M.A.'s CST, Dr. Holmes noted that an issue of concern was M.A.'s elopement from the program. (App.371.) Holmes noted that M.A. had a fascination with vans with tinted windows, which often caused a tantrum or an elopement into the parking lot. (Id.) Dr. Holmes also observed a significant amount of frustration over M.A.'s lack of progress and his aggressive behavior. Mr. A advised that he felt M. should be able to get things out of his system. Mrs. A questioned "how much of a battle do we want" with M. The home therapist and Mrs. Collins indicated that M. needed demand situations in order to *356 learn, and Ms. Adams, the speech therapist, indicated that M. needed to focus on functional skills that will enable him to be an independent and active part of the community. (Id.)
After his observation of M.A. and participation in CST meetings, Dr. Holmes made several general recommendations in order to address the frustrations of the family and CST. First, Dr. Holmes asserted that it was critical to teach M.A. to adapt to environmental challenges. (App.371.) Contrary to what G.A. and E.A. suggested, Dr. Holmes concluded that it would not be productive to allow M. to "get things out of his system" and while it would not be productive to constantly "do battle," engagement of M. was necessary for his learning. (Id.) Additionally, Dr. Holmes reported that the constant food reinforcers (popcorn, licorice, french fries) were not helping M.A. learn to generalize skills, and also that extra staff or attention on M. would be counter productive. (App.371-72.) Dr. Holmes concluded that:
[M.A.] ... require[s] a program that is more specialized than what is currently in place. I feel that he would benefit more from a curriculum focused on vocational skill development and activities in daily living. A functional curriculum for [M] is absolutely critical at this point in his development. Although an inclusion program may benefit him, I am leaning more towards a more specialized program where he has peers that also have learning challenges that he can engage in with interactive skill development rather than parallel skill development that currently exists. ... I would like to see a reduction of the accommodations he currently has, primarily because I believe these have caused more problems than not.
(App.372)(emphasis added). Additionally, Dr. Holmes noted that Voorhees has attempted to create a successful inclusion program for children with autism, thus creating the appropriate "superstructure" for an appropriate educational experience, but has failed to implement an effective delivery of the system to M.A. (App.374.)
Dr. Holmes makes numerous specific recommendations for M.A.'s program at Osage, which G.A. and E.A. claim were not implemented at Osage. (App.375-76.) Those recommendations, as highlighted in his testimony before the ALJ, are as follows. First, Dr. Holmes recommended a thorough occupational therapy evaluation, specifically focusing on M.A.'s sensory-motor weaknesses. (8T 56:5-15; App. 375.) Dr. Holmes conceded that M.A. was receiving occupational therapy ("OT") at Osage, but indicated that there are several schools of OT training, one being rehabilitative, which is not useful for autistic children, and another being adaptive physical education, similar to the OT offered at Eden. (8T 56:16-58:24.)
Second, Dr. Holmes recommended addressing unacceptable aggressive behavior, usually expected in response to demands, with mild restraints. (8T 59:1-22; App. 375.) By mild restraints, Dr. Holmes meant anything from physical prompting of M.A. to application of a basket hold, which requires a person to stand behind the child, holding his hands across his chest, and making sure that the child does not head butt the restrainer, to the use of a mechanical "Humane Restraint," which would restrain a child's hand at his side at a desk while the child was guided through a task. (8T 59:23-61:24.) Dr. Holmes indicated that all these physical restraints were in use at Eden, and that such restrains would have to be implemented at Osage for M. to garner educational benefits from his instruction there. (8T 61:25-62:14.) Dr. Holmes opined that, in his experience, M.'s challenging behavior is far *357 more significant than the typical elementary school child, although less severe than some students at Eden. (8T 62:15-63.) Dr. Holmes did not indicate that he had seen more challenging behavior than M.A.'s managed in a public school setting.
Third, Dr. Holmes recommended training M.A. toward independence by reducing the amount of immediate supervision over him. (8T 79:3-25; App. 375.) As an example, Dr. Holmes indicated that a teacher should eventually be able to give M.A. a picture card of his next activity, which would prompt him to go to that activity without immediate supervision. (8T 79:16-20.) Dr. Holmes also recommended special attention to M.A.'s pica (self-injurious) behavior, his self-stimulatory behavior, practical academic instruction (money exchange, sign reading, time telling), and increased social interaction, aided by teachers. (App.375-76.) Dr. Holmes concluded his May, 2000 report by stating that M.A.'s current program is well designed, yet ineffective in its delivery, and recommended implementation of his suggested program modifications. (8T 81:2-82:13; App. 376.)
Dr. Holmes also produced a second written report, dated December 29, 2000, as a follow-up to his May, 2000 program evaluation. (App.351-53.) In the follow-up report, Dr. Holmes indicated that the recommendations made in his May, 2000 report were necessary for M.A. to receive a FAPE at Osage and for him to garner educational benefit from the program. (App.351.) Dr. Holmes acknowledged that immediately after the recommendation in his previous report, Voorhees had a thorough occupational therapy evaluation performed on M.A. (App.351.) Dr. Holmes also noted in the follow-up report that the behavioral intervention strategies in place for M.A. should be revisited to reduce M.A.'s assaultive behaviors, enable skill acquisition, and prevent escape/avoidance behavior. (App.352.)
The follow-up report considered Durand and Burlington County Special Services as out-of-district placements for M.A.[9] Dr. Holmes concluded that M.A.'s program at Osage meets his educational needs and is superior to the Durand and Burlington programs. (App.353.) Dr. Holmes reported concerns about the overall effectiveness of M.A.'s behavioral intervention program, but noted that M.A.'s 2000-01 "IEP is very thorough and covers all of the necessary domains and practical/functional programming necessary for M.A. to acquire appropriate skills that will serve him well in adulthood." (App.353.) Dr. Holmes finally concluded that M.A.'s "current program will, with minor fine tuning, garner him educational benefit, and is least restrictive for him at this time. This must be reevaluated on a semi-annual basis to determine if it continues to meet his educational needs. An outplacement may be appropriate in the future ...." (App.353.)

H. G.A.

The eighth witness to testify before the ALJ was G.A., plaintiff's father. (App. 44-45; 7T 117-233, 9T 4-157.) Mr. A attributed most of M.A.'s problems during the 1999-2000 school year to Rebecca Null, who he felt was an ineffective and disinterested teacher for M. (App.43.) Mr. A also indicated that it was his opinion that Ms. Null's improper response to M.'s aggressions was the cause of his poor behavior and decreased learning. (7T 138:4-25.) He indicated that she was afraid of M and reduced demands upon him in order to avoid him. (7T 139:2-15.) Mr. A objected *358 to Ms. Null and aides wearing black leather gloves to protect themselves from M.'s aggressions because they were stigmatizing to M.A. and did not address the aggressive behavior. (7T 144:1-145:14.)
Mr. A testified that he and his wife rejected the June 2000-2001 IEP because it called for an out-of-district placement. (App.44.) They did, however, visit some out-of-district programs. (Id.) First, they visited Douglass, which both the A.'s and the ALJ concluded was inappropriate. (7T 174:16-178:21; App. 44.) Next, they visited Gloucester Special Services (Baimbridge), which they felt was inappropriate because there was no mainstreaming and the children were older than M.A. (7T 183:7-185:25; App. 44.) Next they visited and ruled out Durand, which no longer has a program for autistic children and was not recommended by the ALJ. (App.44.) Last they visited and rejected the Burlington program, which was not recommended by the ALJ. (7T 194:18-197:23.)
Mr. A testified that when M. returned to a self-contained classroom at Osage in October, 2000, his behavior improved. (App.44.) Mr. A attributes this improvement to Jeff Giancaterino. (7T 198:2-202:13.) Mr. A. also noted that M.'s behavior was improving despite the reduced amount of home instruction. (App.44.) Mr. A indicated that he felt M.'s behavioral problems on outings to Great Adventure (7T 221:18-222:9), during a game of Candyland (7T 222:10-223:9), and Strawbridge's store (7T 227:24-231:10) were minor and not as severe as described by Voorhees. (App.44.) Mr. A indicated that he wanted M. to remain at Osage because they already had a program for him there with a good teacher. (7T 231:11-232:24.)
Mr. A. did not deny that Dr. Holmes had suggested Eden as an appropriate placement for M although his attorney continuously indicated that Eden had no openings. (9T 82:9-85:8.) Mr. A indicated that he was happy with M.A.'s placement at Osage. (App.45.)

I. E.A.

The ninth witness to testify before the ALJ was E.A., plaintiff's mother. (App. 46; 9T 158-169.) Mrs. A testified about the incident at the Strawbridge's store. Mrs. A indicated that M. had an approximately twenty minute tantrum at the store during which he took off his socks and shoes. (159:2-163:6.) Mrs. A testified that she felt M. needed more such outings. (9T 163:7-164:3; App. 46.)

J. Raymond Brossel

The tenth and final witness to testify before the ALJ was Raymond Brossel, the Superintendent of Schools for the Voorhees School District. (App. 46; 9T 177-181.) Mr. Brossel testified about a conversation he had with Dr. Holmes on March 7, 2000 about M.'s behavioral problems. (App.46.) Mr. Brossel testified that during this conversation, Dr. Holmes advised him that M.'s behavioral problems could not be addressed in a public school and were more appropriately addressed at a private school placement. (9T 178:8-18.) This inconsistent opinion by Dr. Holmes would impeach Dr. Holmes's view that the present placement is appropriate, but it is not apparent that Dr. Holmes was questioned or given a chance to explain about his conversation with Superintendent Brossel.

III. DISCUSSION

A. Plaintiff's Motion and Defendant's Cross Motion for Summary Judgment

Plaintiff M.A. and his parents G.A. and E.A. now move for summary judgment, asserting that defendant Voorhees may not exclude M.A. from Osage, his local public *359 school, despite his severe autism, pursuant to the IDEA and Section 504. Plaintiffs assert that the education M.A. is now receiving at Osage, if enhanced and adapted as recommended by their expert, is appropriate and the least restrictive for him. (See 2000-01 IEP, App. at 512.) Defendant cross-moves for summary judgment and an affirmance of the ALJ's decision, which concluded that Voorhees was unable to provide M.A. with a FAPE in the LRE in district at Osage and ordered that M.A. be placed at one of four out of district schools with programs for autistic children for 2001-02, consistent with the 2000-01 IEP. Voorhees argues that M.A. is not making any meaningful educational progress in-district at Osage, and seeks to locate an appropriate out-of-district school placement as soon as possible. Voorhees does not dispute that M.A. would still be integrated into some programs, such as art and physical education, at Osage during the out-of-district placement. Plaintiffs contend that M.A. has made progress during the 2000-01 school year at Osage under the instruction of Giancaterino and would make more progress if Voorhees implemented more specialized programs to address M.A.'s needs.

1. Standard of Review

The standard of review under which this Court considers an appeal of a state administrative decision under the IDEA "differs from that governing the typical review of summary judgment." Heather S. by Kathy S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir.1997). Section 1415(i)(2)(B) of the IDEA provides that district courts "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has required that federal district courts afford "due weight" to state administrative proceedings in evaluating claims under the IDEA. See Board of Education v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Third Circuit has held that district courts have discretion to determine how much deference to accord the administrative proceedings, and although the district courts "must consider the administrative findings of fact, they are free to accept or reject them." Oberti v. Board of Educ., 995 F.2d 1204, 1219 (3d Cir.1993). "But if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure." Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 527 (3d Cir.1995), cert. denied, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996)(citing Doyle v. Arlington County School Bd., 953 F.2d 100, 105 (4th Cir.1991)). And when there is no new evidence presented to the district court, as in this case, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." Heather S., 125 F.3d at 1052 (quoting Hunger v. Leininger, 15 F.3d 664, 669 (7th Cir.), cert. denied, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994)). Since neither party has presented new evidence, this Opinion decides the case based upon the administrative record.

B. Analysis: The 2000-01 IEP

Plaintiffs seek relief from the Administrative Law Judge's decision of May 1, 2001, which determined that Voorhees was unable to provide M.A. with a FAPE in the LRE in district and ordered that M.A. be placed in Eden during the remainder of the 2000-2001 school year, and also that M.A. be placed at one of four schools with *360 programs for autistic children during the 2001-2002 school year.
The main issue to be decided by this Court is whether Voorhees has met its burden of showing that the 2000-01 IEP, which calls for M.A.'s placement in a yet to be determined out of district placement, provides M.A. with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") under the IDEA. Plaintiff asserts that defendants have failed to demonstrate that M.A. cannot receive a FAPE at Osage, his neighborhood school, and also that placement at a special out-of-district school for autistic children is not the LRE. Plaintiffs seek for M.A. to remain at Osage, where he has been educated in a class of one with limited inclusion with other non-disabled children, since October 23, 2000, because they feel that with proper resources and attention, M.A. would be satisfactorily educated there. Plaintiffs also assert that there is no sufficient evidence in the record to support the ALJ's decision that M.A. should be placed at Eden, Sawtelle, Bancroft, or Gloucester. Essentially, plaintiffs challenge M.A.'s IEP only insofar as it requires placement at an out of district school for special needs children, which they assert would be more restrictive and prevent meaningful interaction with non-disabled children. M.A.'s parents also seek implementation of Dr. Holmes's suggestions, detailed above.
Voorhees, conversely, asserts that the decision of the ALJ is based upon the preponderance of credible evidence in the record and also that M.A. is not and cannot receive a meaningful educational benefit exclusively at Osage, where he is taught in a classroom of one, has demonstrated limited improvement over several years, and has minimal interaction with other nondisabled students only for gym, art, lunch, and recess. Voorhees requests that this Court affirm the decision of the ALJ and, if necessary, remand this action for further consideration of the IEP implementation issues, with a direction that the parents fully cooperate with the district in finding an appropriate out of district placement.
This Court, finding more than ample evidence in the record to support Judge Goldberg's conclusions, accepting the ALJ's findings of fact, and also finding that M.A. requires placement at an out-of-district school with a program for autistic children in order to obtain a meaningful educational benefit, will affirm the ALJ's decision and direct that M.A. be placed at one of the three schools (Eden, Bancroft, or Sawtelle-Collingswood) identified by the ALJ,[10] whichever has the first vacancy.

1. Individuals with Disabilities Education Act ("IDEA")

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA requires that states receiving federal funds for education must provide every disabled child with a "free appropriate public education," 20 U.S.C. § 1412(a)(1) and (a)(5), the core of which is embodied in the Individualized Education Plan ("IEP"), the package of special educational and related services designed to meet the unique needs of the disabled child. See Rowley, *361 458 U.S. at 181, 102 S.Ct. 3034; Scott P., 62 F.3d at 526 (citing Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989)).
The IDEA statutory framework imposes dual requirements on school districts, mandating both substantive and procedural compliance: first, they must provide an "appropriate" education to a child with special needs, and second, they must construct a program in the LRE and appropriate to the needs of the child. Scott P., 62 F.3d at 533-34 (citing Rowley, 458 U.S. at 200, 102 S.Ct. 3034); 20 U.S.C. § 1412(5)(B).

2. Free Appropriate Public Education ("FAPE")

The Supreme Court has construed the FAPE provision of the IDEA to require "education specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child `to benefit' from the instruction." Rowley, 458 U.S. at 200, 102 S.Ct. 3034. In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed. Scott P., 62 F.3d at 533 (citing Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1219 (3d Cir.1993)). In assessing whether the educational program as embodied by an IEP is appropriate, "[d]istricts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a `basic floor of opportunity.'" Scott P., 62 F.3d at 533-34 (quoting Rowley, 458 U.S. at 201, 102 S.Ct. 3034).[11] However, Rowley requires that a school district demonstrate that an IEP is sufficient to confer more than a trivial or de minimus educational benefit; indeed, the IEP must confer a meaningful educational benefit. Polk, 853 F.2d at 181 (reversing district court's granting of summary judgment where material issues of fact remained as to whether district's refusal to provide direct physical therapy conferred meaningful benefit); Oberti, 995 F.2d at 1213; see also T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 577 (3d Cir.2000) ("`[T]he provision of merely more than a trivial educational benefit does not meet' the meaningful benefit requirement of Polk.") (quoting Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 247 (3d Cir.1999)). Thus, the relevant inquiry is not whether the IEP confers more than a trivial benefit, nor whether the IEP confers the optimum benefit, but whether the IEP, which calls for placement in an out of district school, would confer a meaningful educational benefit upon M.A. See T.R., 205 F.3d at 576 ("By failing to inquire into whether the Board's IEP would confer a meaningful educational benefit on N.R., the District Court applied the incorrect legal standard on this issue.") (emphasis in original).
Defendant Voorhees, in contrast to many school districts involved in IDEA cases, argues that it cannot provide M.A. with a FAPE in the LRE in-district at *362 Osage. The record reveals that Voorhees has made numerous attempts and adjustments in an attempt to achieve a meaningful educational benefit for M.A., with limited success. Plaintiffs do not appear to challenge the substance of the IEP, except to the extent that it calls for placement in an outside school "to be determined." Plaintiffs additionally argue that Voorhees has failed to provide all the services recommended by their expert, Dr. Holmes.
To determine whether M.A.'s educational program at Osage is appropriate, this Court must assess whether M.A.'s educational needs were adequately addressed by the June 2000 IEP for the 2000-2001 school year. The IDEA requires "education specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child `to benefit' from the instruction." Rowley, 458 U.S. at 188-89, 102 S.Ct. 3034. The Third Circuit has stated that the educational benefit of an IEP "must be gauged in relation to a child's potential." Kingwood, 205 F.3d at 578. The appropriateness of an IEP, however, may be successfully challenged "by identifying particular needs not addressed" in the IEP at issue. Scott P., 62 F.3d at 534 ("[I]f a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate."). The relevant inquiry here is whether plaintiff's IEP would confer a meaningful educational benefit on M.A., not just "more than a trivial education benefit." T.R., 205 F.3d at 576.
This case is different from many FAPE cases because plaintiff's parents appear determined to keep M.A. at Osage, regardless of whether he receives more than minimal educational benefit there. Plaintiffs assert that Voorhees has failed to implement the suggestions made by their expert, Dr. Holmes, such as 1) a thorough occupational therapy evaluation; 2) appropriate use of physical restraints in response to aggressions; 3) socialization with peers; and 4) independence training.[12] Plaintiffs further assert that if Voorhees had implemented the suggestions made by Dr. Holmes, M.A. would get a FAPE in the LRE at Osage.
A review of the record indicates that, while M.A. has demonstrated some progress under Giancateriano's instruction, he is at an age and disability level that requires specialized, out-of-district instruction. Additionally, plaintiff's own expert Dr. Holmes continuously notes that Voorhees has done more to work with M. and achieve an appropriate inclusion program for autistic children than any other public school he has seen in his long career. (App. 353, 8T 27:19-28:10, 8T 46:8-18.) M.'s current teacher is extremely attentive to M. and gets along well with him and his family. (7T 198:2-202:13.) There is no evidence in the record that strongly supports the conclusion that M. is receiving the appropriate education he so desperately needs at Osage, despite the best efforts of teachers, consultants, and family members. Plaintiff's own expert Dr. Holmes qualified his lukewarm endorsement of the Osage program by indicating that the program *363 must be "monitored on a regular basis" and "re-evaluated on a semi-annual basis" and added that "[a]n outplacement may be appropriate in the future." (Holmes December, 2000 Report, App. 353.)
Plaintiffs also assert that the ALJ ignored the progress made by M.A. during the 2000-01 school year under his then new and now current teacher, Jeff Giancaterino, and therefore that the education that M.A. is now receiving at Osage is "appropriate." (Pl.'s Br. at 13-14, 18; Pl.'s Reply Br. at 2-3.) Plaintiffs argue that at the end of the 1999-2000 school year, which both parties acknowledge was riddled with problems for M.A., "Voorhees decided to exclude [M.A.], and the subsequent progress he made under Giancaterino fell on deaf ears because Voorhees staff closed their minds and wanted him out." (Pl.'s Br. at 34.) Plaintiffs offer no evidence in support of this theory that Voorhees "wanted him out" and plaintiffs' own expert continuously references how accommodating the Voorhees district is with disabled children. When the record does not support their claim, it is disheartening that the plaintiffs impugn the motives of the professionals at Osage who have clearly gone to great lengths to educate M.A.
Defendant does not dispute that M.A. made some improvement during the 2000-01 school year and that Mr. Giancaterino has had more success with both M.A. and his parents than Ms. Null. (Def.'s Br. at 21-22.) Defendant argues, however, that the law requires that M.A. get a meaningful educational benefit, which it asserts cannot be obtained at Osage despite the best efforts of the staff, rather than some marginal educational or social benefit, which it asserts, at best, M.A. is currently receiving. Mr. Giancaterino testified that, taking everything into consideration, M.A.'s program at Osage is not proper. (See 5T at 204:7-22.)
Therefore, the Court finds that the IEP itself, which calls for more specialized instruction at an appropriate out-of-district placement, was and is reasonably calculated to confer a meaningful educational benefit upon M.A. Indeed, plaintiff's expert himself opined that "[a]lthough an inclusion program may benefit [M.A.], I am leaning more toward a specialized program where he has peers that also have learning challenges that he can engage in with interactive skill development rather than parallel skill development which currently exists." (App. 367-76, May 31, 2000 Holmes Report.) Dr. Holmes also opined that M.A.'s "IEP is very thorough and covers all of the necessary domains and practical/functional programming necessary for M[] to acquire appropriate skills that will serve him well in adulthood." (Holmes Report, December 2000, App. 353.)
The true disagreement in this case is whether implementation of this IEP should take place at Osage, or in a yet to be determined out-of-district placement.[13] *364 Contrary to what plaintiffs assert, the IDEA does not require the district to ensure that M.A. receives what his parents believe is the optimal (or adequate) educational benefit, nor must it create a "little Eden" within the district to meet the parents' demands and preferences. To rule so would place an insurmountable burden on school districts and take focus away from the educational needs of the child. Additionally, plaintiffs rest their argument on the presumption that Mr. Giancaterino, M.A.'s present teacher, or someone equally able to handle M.A. and his parents, will be M.A.'s teacher for the remainder of his time in the Voorhees district. Plaintiffs admit that Ms. Null, who was more academically qualified and experienced than Mr. Giancaterino, was unable to adequately "handle" M.A. and confer any educational benefit.
Therefore, this Court concludes that the 2000-01 IEP as written, as considered by the ALJ, and as acknowledged by the plaintiff's expert, was appropriate.

3. Least Restrictive Environment

The outcome of this case turns on whether education at an out-of-district placement is the LRE in which M.A. can receive a FAPE. The LRE component of the IDEA reflects the statute's goal of "mainstreaming" children with special needs into regular classrooms. The IDEA requires states to establish "procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped." T.R., 205 F.3d at 578 (quoting 20 U.S.C. § 1415(5)(B)(1994));[14]see also 20 U.S.C. § 1412(a)(5)(A). The Third Circuit has interpreted this requirement to mean that a disabled child must be placed in the LRE that will provide him with a meaningful educational benefit. See Scott P., 62 F.3d at 535 ("The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."). The correct standard to be applied in determining the LRE is not to find an optimum placement, but to decide whether an appropriate educational placement can be achieved in a non-restrictive setting. Scott P., 62 F.3d at 532.
Plaintiffs challenge M.A.'s placement in any out-of-district program, which they argue would be overly restrictive and inappropriate for properly "mainstreaming" M.A. E.A. and G.A. assert that the program currently in place at Osage, where M.A. is in a class of one and has minimal interaction with nondisabled students only during recess, lunch, gym, and art, is less restrictive than the IEP plan, which provided for instruction at a specialized school for autistic children among other special needs children at an out-of-district school, with inclusion and participation in art and physical education at Osage with non-disabled children, similar to the inclusion M.A. currently enjoys at Osage. (See App. at 512.)
Plaintiffs' expert, Dr. Holmes, opined that M.A. requires "[a] functional curriculum" and that "[a]lthough an inclusion program may benefit him, I am leaning more towards a more specialized program where he has peers that also have learning challenges that he can engage in with interactive *365 skill development rather than parallel skill development which currently exists." (See Holmes Report, May 31, 2000, App. 367-376, at 372.) Dr. Holmes also noted that excessive accommodations for M.A., such as having his own class within a class and additional aide attention, were not helpful and should be reduced. (See id.)
Dr. Holmes's follow-up report, dated December 29, 2000, notes that M.A. is in his own classroom at Osage, staffed with a teacher (Giancaterino), a teaching assistant, a Douglass consultant (DeGeorge), an occupational therapist (Cuthbertson), a case manager (Cook), and an a speech pathologist. (See Holmes Report, December 29, 2000, App. 351-53, at 352.) The follow-up report also indicates that Dr. Holmes was impressed with the quality of Giancaterino's teaching expertise and also with the cohesiveness of the team working with M.A. (Id.) Without addressing the lack of "inclusion" for M.A. at Osage, Dr. Holmes concluded that "his program meets his educational needs and is far superior over his other inclusion program" and also that "his current program will, with minor fine tuning, garner him educational benefit, and is least restrictive for him at this time." (Id. at 353.)
The Third Circuit in Oberti adopted a two-part test for assessing a school district's compliance with the LRE requirement of the IDEA. "First, the court must determine whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." Oberti, 995 F.2d at 1215. Factors to consider in determining this first prong are: (1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom. Id. at 1215-17. The second requirement mandates that if the court finds placement outside a regular classroom is necessary, the court must examine "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." Id.

a) Mainstreaming in a "Regular" Classroom

In reviewing the record, the Court's first inquiry is whether education in the regular classroom, with the use of supplementary aids and services, could have been achieved satisfactorily. The Court first looks at what steps Voorhees took to accommodate M.A. in a regular classroom.
The Voorhees defendants made significant efforts to educate and include M.A. at Osage, and have attempted numerous modifications. Plaintiffs' expert Dr. Holmes testified about the district's constant reevaluations of M.A.:
The Voorhees School System has placed a significant amount of resources behind this young man's program and they meet on a frequent basis, if not weekly, at least semi-monthly to review his progress and in these meetings it's my understanding that all the significant players in M.'s life and in the district attend these meetings to review his progress andand to also reflect with the consultant, Douglas Outreach consultant, the progress made forby M. during the previous period of time, whether it be a week or two week period of time. Included in these meetings are also the parents and so they also have the opportunity to reflect upon progress or a lack thereof and they'rethey're very thorough, very expansive and taken extremely seriously, so I was quite impressed *366 withwith thethe quality and the quantity of these meetings.
8T 27:19-28:10. Dr. Holmes additionally testified that although he felt M.A.'s program was not effectively working, that failure was not due to any lack of trying by Voorhees:
The Voorhees Public School System, of all the school systems I've observed in my professional career, has done more toto try to have this inclusiveinclusion program work than I would've ever expected from any other public school system. They have put significant resources behind this. Much more, many more significant resources than you would even find in ain some specialized programs.
8T 46:8-18. In fact, even on cross-examination, Dr. Holmes testified that he is "complimentary to the Voorhees district because relative to my experiences I've never seen a district that has done as much." 8T 223:16-23.
In the instant matter, M.A.'s parents are content with their child being educated in a classroom by himself, so long as he has at least minimal interaction with other children during the day, for example in lunch, art, gym, and recess. Even Dr. Holmes indicated that M.A. had no real social engagement with other children, despite his "inclusion." (App.369.) In his testimony on cross-examination Dr. Holmes touched upon a significant problem in this case, which appears to be the tension that has emerged between two parties, both of whom care deeply about M.A. and who seek to have him educated, and also the reality that M.A. is getting to a stage where he needs more a focused, appropriate educational curriculum:
We've got a parenttwo parents who are deeply committed to seeing their young man stay in his local public school as long as he's garnering educational benefit. The district has accommodated that and they continue to accommodate that, but there is a point of no return, as well, and that point of no return is as he gets older, and we're not talking years and decades from now, in the nextnext year, next months, we have to evaluate to see whether, given the proper tweeks on this program, whether he can garner, even increased educational benefit just to give him that final shot before we move on to something maybe more specialized.
8T 164:10-22.
T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572 (3d Cir.2000) is instructive when analyzing the mainstreaming component. In T.R., the district court held that a handicapped student's placement in a preschool program in which half the children were handicapped was the least restrictive environment. Such a class, however, was deemed more restrictive than a "regular," fully-mainstreamed preschool class. Under the IDEA's mainstreaming requirement, the Third Circuit stated that a hybrid preschool program such as this "would ordinarily provide the LRE only under two circumstances: first, where education in a regular classroom (with the use of supplementary aids and services) could not be achieved satisfactorily or, second, where a regular classroom is not available within a reasonable commuting distance to the child." T.R., 205 F.3d at 579. The court found that the record contained no evidence that T.R. could not have been educated satisfactorily in a regular classroom. In addition, testimony indicated that T.R. could have received a meaningful benefit from education in a regular classroom. The court ruled that "the school district is required to take into account a continuum of possible alternative placement options when formulating an IEP, including placing children with disabilities *367 in private school programs for non-disabled preschool children." T.R., 205 F.3d at 579-80 (internal quotations omitted). The Third Circuit held that the district court erred in not inquiring into whether regular classroom options were available within a reasonable distance to implement the child's IEP, remanding to the district court to consider the question.
Here, in contrast to the situation in T.R., the record is replete with evidence that M.A. cannot be substantially included in a mainstream classroom. Plaintiffs themselves do not even argue that complete mainstreaming is an option. Plaintiffs are satisfied with M.A.'s current teacher and seek only for Voorhees to add the program enhancements discussed by Dr. Holmes, to make M.A.'s program within Osage more like a specialized out-of-district autism program. Dr. Holmes's opinion of the effectiveness of M.A.'s program at Osage, even with the "tweeks" and recommendations he contemplated, is lukewarm at best, and does not give persuasive support for full inclusion at Osage.
So, the court must determine whether M.A. has the ability to receive educational benefit from his enclosed, bubble-like program within Osage.

b) Ability to Receive Educational Benefit

The Court, under the second prong, looks at whether M.A. could receive an educational benefit in a regular classroom setting. Plaintiffs seek to have M.A. mainstreamed to the maximum extent possible, which they purport is how he is currently situated, even though he is "included" only during homeroom, art, gym, and lunch and has minimal to no real interaction with other peers. The record reveals, and plaintiffs' expert acknowledges, that M.A. is receiving "parallel skill development" at Osage, that is, although he is physically mixed with non-disabled children during homeroom, lunch, gym, and art, he has no meaningful interaction with them. (App. 372, Holmes Report; App. 535-36, Breslin report; Null Testimony 6T 94:17-95:12.)
Plaintiffs point to the testimony of Dr. Holmes and G.A. in support of their conclusion that M.A. is getting enough educational benefit at Osage. Dr. Holmes is quite reserved in his endorsement of the Osage program's appropriateness for M.A. (See Holmes Reports of May and Dec. 2000, discussed above.) Dr. Holmes opines that the program, with some fine tuning, could garner him educational benefit. (App.353, December Report.) When asked whether he felt M. could receive and appropriate education in-district at Voorhees, Dr. Holmes replied that he did, but qualified that answer by saying, "I want to make it very clear to the court that M. is a very fragile young man and we want to make certain that we keep our eyes closely peeled on this program because they have put significant resources behind it...." (8T 113:9-23.) Dr. Holmes indicated he was only "guardedly optimistic" that the program at Osage, with some refinements, might allow M. get an educational benefit. (8T 178:4-22) Dr. Holmes admitted that his recommendation for M. would be different if G.A. and E.A. were not so vehemently opposed to an out-of-district placement. (8T 181:23-182:25.) His understandable desire to serve his clients also weakens the weight of his opinions in this case, in this Court's view.
Based on the above, the Court finds that M.A. will not likely receive a meaningful educational benefit at Osage. It is clear that M.A. needs specialized, individual instruction at Osage, which he receives in a classroom of one, and also that he has minimal interaction with other non-handicapped students, similar to what he would receive pursuant to the current IEP even *368 if he were being educated at an out-of-district school for children with special needs. G.A. and E.A. present no evidence to rebut the defendant's showing that M. cannot receive a meaningful educational benefit at Osage.

c) Effect M.A. Would Have on Others

Under the third prong, the Court looks at the effect that M.A. has on the regular classroom. A review of the administrative record indicates that M.A.'s presence at Osage has created some apprehension among other students and some injury to both students and teachers. (See Breslin Report, App. at 532; Giancaterino Testimony 5T 146-161; App. 661-685, photographs of staff injuries; Null Testimony 6T 96:23-103:8.) Testimony and evaluations revealed that M.A. showed aggression to other students and teachers at Osage and also that he frequently threw tantrums and attempted to elope from the classroom. (See Breslin Report, App. 533, 536-37; Giancaterino Testimony 5T-157-161; Null Testimony 6T 103:10-104:3.) Plaintiff's expert Dr. Holmes classified M.A. as having "significant autism" (8T 34:15-16), a "disinterest in social engagement" (8T 35:2-3), and "significant behavioral challenges, self-injurious and assaultive behaviors, and likely obsessive-compulsive disorder." (8T 35:24-36:6.) Such negative behavior, while slightly diminished during the 2000-2001 school year under the instruction of Jeff Giancaterino, as discussed above, continued up until the time of the ALJ's decision and limited M.A.'s meaningful benefit from instruction at Osage. As a result of such behavior, M.A.'s "inclusion" time at Osage was reduced. Unfortunately, there was little recourse but to reduce inclusion experiences.
Even if M.A. receives his instruction at an out-of-district placement, as called for in the IEP, he will still have some inclusion with other, non-handicapped children at Osage. The inclusion called for by the IEP, which is approximately the same amount of inclusion he currently receives at Osage, would allow for the social benefits to M.A. and the community at large which Mr. and Mrs. A seek for their son. As discussed by Chief Judge Gerry when the Oberti case, supra, was before this Court:
We are impressed by the common sense of this preference for inclusion. Brown v. Board of Education, 347 U.S. 483, 493, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954), highlighted the importance of education and the inequality inherent in any segregated educational system. The point of the IDEA is to bring children with disabilities back into the community to which they belong. The fact that this approach benefits every member of the community, not simply children with disabilities, is often overlooked. The goal of this type of integration is not only for people with disabilities to learn to live and function in the community, but also for those community members without disabilities to learn to live and function along with them.
Oberti, 789 F.Supp. at 1326 n. 7, cited in D.B. v. Ocean Township Bd. of Educ., 985 F.Supp. 457, 489 n. 25 (D.N.J.1997).
In conclusion, this Court finds that education at Osage, even with one-on-one instruction and supplementary aids and services, will not provide M.A. with any meaningful educational benefit as that term is used in the IDEA, supra. Additionally, M.A. currently has minimal interaction with non-disabled students and has been observed as being disruptive to their learning, while achieving little or no detectable benefit for his own learning.

*369 4. Recommended Placements

The ALJ heard testimony and argument and reviewed evidence concerning the appropriateness for M.A. of the autism programs at Eden, Sawtelle-Collingswood, and Bancroft. Catherine Cook, a school social worker, gave testimony about the appropriateness of the out-of-district placements for M.A. (See 7T 54:11-117:17.) Dr. Holmes testified about the quality of the programs at Eden, where he is the director, and Sawtelle, which is run by former Eden associate, Dr. James Ball. (See 8T 125:12-127:7.) The ALJ found that each of these placements had programs for autistic children and that each was within an appropriate driving distance from plaintiffs. (App.46-50.) Defendant asserts that there is ample evidence in the record to support the ALJ's determination. Plaintiffs have never argued that Eden and/or Bancroft are inappropriate for M.A.; they only assert that each has no openings. Additionally, although plaintiffs objected to the introduction of testimony about Sawtelle-Collingswood, saying that the district cannot "continually change its offer [as to a possible placement] as time goes on," which plaintiffs' attorney likened to a "moving target" (7T 59:13-60:2), their objection was overruled.
First, as to Sawtelle, Ms. Cook testified that she had visited the established Sawtelle placement in Montclair, New Jersey, which is a behaviorally based program that develops individual programs for children's needs, uses discreet trials, and emphasizes the generalization of learned skills. (See 7T 61:12-62:25.) Ms. Cook further testified that Sawtelle was opening a facility in Collingswood, which would employ the same philosophy and general techniques as the school in Montclair. (See 7T 61:5-62:17.) Ms. Cook testified, and Dr. Holmes concurred, that the Collingswood program's director would be a former Eden associate, Dr. James Ball, who was extremely respected and qualified to oversee such a program. (See 7T 63:7-65:17; 8T 125:12-126:16.) Dr. Holmes indicated that Sawtelle would be an appropriate placement for M.A. as long as they had the proper age range. (See 8T 167:6-10.) Ms. Cook indicated that the Sawtelle School in Collingswood would have classes for the 11-14 age range, which is M.A.'s age range. (See 7T64:18-65:17.) Ms. Cook discussed all the programs to be offered at Sawtelle-Collingswood, many of which would benefit M.A. (See 7T 67:11-72:11; Supp.App. 30, Ex. P-35, Sawtelle-Collings-wood Brochure.)
Second, as to Eden, there is no dispute that it is a high quality, fully functioning placement for autistic children, with appropriate teachers and counselors and creative programming. Plaintiffs' expert, Dr. Holmes, is the director of Eden and testified that its middle school childhood programs and transitional programs would be appropriate for M.A. (8T 189:5-194:22.) Third, as to Bancroft, there is no evidence it is not an appropriate placement. Plaintiffs' only issue with Eden and Bancroft is that they assert there is no room for M.A. at either program.
This Court, therefore, finds that each of the three out-of-district placements identified by the ALJ, with the exception of Gloucester which is not appropriate for M.A. (see supra, n. 10), was shown to be appropriate for M.A.'s educational needs by a preponderance of the evidence. Plaintiffs should cooperate fully with the District and the application processes of each of the out-of-district placements.

IV. CONCLUSION

Upon the record of this case, Voorhees has shown that M.A.'s education at Osage, even with supplementary services as recommended by Dr. Holmes, would not provide M.A. with a meaningful educational *370 benefit. That G.A. and E.A. would prefer for Voorhees to develop a "little Eden" within the school district, arguing that such an arrangement would be optimal for M.A., does not put that heightened responsibility upon Voorhees. The law requires that the proposed IEP provide a FAPE in the LREit does not and cannot require that the district provide the best education in exactly the manner dictated by parents. Voorhees presented ample evidence to the ALJ, in the form of testimony, expert witnesses, and documentation, showing that M.A. was receiving little to no meaningful educational benefit from his instruction at Osage, even under Giancaterino. Additionally, M.A. is more isolated at Osage than he likely would be at a place like Sawtelle, Bancroft, or Eden. G.A. and E.A. have not presented sufficient evidence to rebut the district's showing that M.A. would receive a FAPE in the LRE at one of these out of district schools with programs for autistic children. Voorhees's educational program, therefore, as proposed in the 2000-2001 IEP, comports with the IDEA's LRE requirement.
For the reasons stated herein, and because this Court finds that the 2000-2001 IEP, directing that M.A. should receive instruction at a placement "to be determined," comports with the IDEA, and because this Court further finds that the ALJ's determinations were correct, the decision will be affirmed. M.A. will be placed at one of the three appropriate placements identified by the ALJ, Bancroft, Eden, or Sawtelle-Collingswood, whichever is first available. Additionally, G.A. and E.A. are directed to cooperate to the maximum extent possible with Voorhees and the CST so that M.A. can start receiving his appropriate education. The accompanying Order is entered.

ORDER
THIS MATTER having come before the Court upon motion by plaintiff M.A., through his parents G.A. and E.A., for summary judgment against defendant Voorhees Township Board of Education in his appeal of the administrative decision rendered by Administrative Law Judge Bernard Goldberg on May 1, 2001; and also upon Voorhees's cross-motion for summary judgment; and this Court having reviewed the parties' submissions and the administrative record below; and the Court having heard oral argument on January 31, 2002; and for reasons stated in the Court's Opinion of today's date;
IT IS on this 29th day of May, 2002, hereby
ORDERED that plaintiff's motion for summary judgment be, and hereby is DENIED;
IT IS FURTHER ORDERED that defendant's motion for summary judgment be, and hereby is, GRANTED, and that defendant's motion for the appointment of a guardian ad litem for M.A., be, and hereby is, DENIED;
IT IS FURTHER ORDERED that the decision of Administrative Law Judge Bernard Goldberg is hereby AFFIRMED to the extent that it found that the June 2000 IEP provided M.A. with an appropriate educational program in the least restrictive environment; and
IT IS FURTHER ORDERED that M.A. be placed at one of the three appropriate placements identified by Judge Goldberg, Bancroft, Sawtelle, or Eden, which ever is first available. G.A. and E.A. are directed to cooperate with Voorhees and the CST in order to ensure M.A.'s placement as soon as possible.
Costs for defendant.
NOTES
[1] Although M.A., a minor, is the named plaintiff, this Opinion will occasionally refer to G.A. and E.A., M.A.'s parents, as "plaintiffs" where applicable.
[2] The IEP for 2000-2001 recommends placement at an out of district school to be announced. After finding that the "Voorhees School district is unable to provide M.A. with a FAPE in District," the ALJ required placement in an out of District day school with a program for providing autistic children with a FAPE, and also concluded that Eden was an appropriate placement for the 2001 extended school year. The ALJ ordered that M.A. be placed in one of the other mentioned schools (Sawtelle, Bancroft, and Gloucester County Special Services School District) for the 2001-2002 school year. (See Ex. 8 at 49-50.)
[3] Both parties acknowledge that there are implementation problems with the IEP over which the ALJ retains jurisdiction. (See Ex. 8 at 50.)
[4] The ALJ held nine days of due process hearings. Testimony was received on September 25, 2000(1T), October 3, 2000(2T), January 24-25, 2001 (3-4T), March 13, 2001(5T), March 15-16, 2001 (6-7T), March 19, 2001(8T), and March 27, 2001(9T).
[5] On behalf of Voorhees, the following seven witnesses testified: Frances S. Collins, Director of Special Services for Voorhees (3T 16-148; 9T 169:22-176:16); Dr. Anita Breslin, an expert witness (4T 5-107; 5T 4-115); Jeffrey Giancaterino, M.A.'s teacher at Osage since October 2000 (5T 123-282; 6T 5-74); Rebecca Null, M.A.'s teacher at Osage during the 1999-2000 school year (6T 75-159); Alexandra (Ali) DeGeorge, Douglass Outreach Program Coordinator (6T 160-274; 7T 4-46); Catherine Cook, an Osage School Social Worker and CST member (7T 46-116); and Raymond J. Brosel, Jr., Voorhees Superintendent of Schools (9T 176-178). Additionally, 52 exhibits were submitted on behalf of defendants.
[6] On behalf of plaintiff M.A., the following three witnesses testified: Dr. David Holmes, director of Eden and an expert witness (8T 4-235); G.A., M.A.'s father (7T 116-232; 9T 4-157); and E.A., M.A.'s mother (9T 157-169). Ten exhibits were submitted on behalf of plaintiffs.
[7] This Opinion will recount the testimony of each of the witnesses, as taken and considered by the ALJ.
[8] G.A., plaintiff's father, gave some testimony prior to Dr. Holmes taking the stand. For the sake of continuity, the Court will discuss G.A.'s testimony after considering that of plaintiff's expert.
[9] These two placements were not recommended by the ALJ as appropriate for M.A. and will not be extensively considered by this Court.
[10] There is no dispute that Gloucester and Douglass were determined to be inappropriate for M.A.
[11] Indeed, the Supreme Court recognized in Rowley that "[w]hatever Congress meant by an `appropriate' education, it is clear that it did not mean a potential-maximizing education." Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. 3034. The Third Circuit has also noted that "[h]owever desirable the goal of maximizing each child's potential may be in terms of individuals, the Court obviously recognized that achieving such a goal would be beyond the fiscal capacity of state and local governments, and that Congress had realized that fact as well." Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 178-79 (3d Cir.1988).
[12] Holmes concedes that M.A.'s 2000-01 IEP is well designed (see Tr. 3/19/01 at 81:16), which is consistent with G.A. and E.A.'s failure to challenge any other aspect of the IEP, but ineffective in its delivery (see id. at 81:16-17). Holmes also testified that M.A.'s primary problem, escape avoidance, is fairly common in public schools because of a reluctance in public schools to use intrusive and hands-on responses to such behavior. (See Tr. 3/19/01 at 81:8 82:13.)
[13] The Court will briefly address the palpable hostility that exists in this case between G.A. and E.A. and the Voorhees defendants. This tension, while perhaps understandable due to an inherently difficult situation, does not assist the parties to do what is necessary, i.e., find an appropriate placement for M.A., so that he might learn the basic tasks and skills that he will need to exist in society. Despite the obvious breakdown in communication between the parties, manifested in negative allegations and even a motion for appointment of a guardian ad litem, the Court observes that both sides genuinely care about M.A. and his education. The disagreement about where M.A. should be educated, in light of his age and disability, should have been worked out by his CST, and not litigated over the course of several years in Court. There is no evidence that any party is motivated by anything other than genuine care for M.A. Defendant's motion for appointment of a guardian ad litem, considered at oral argument, will be denied.
[14] T.R., which addressed an IEP formulated prior to 1997, when Congress amended the IDEA and recodified the definition of the least restrictive environment, cited to the old code section at 20 U.S.C. § 1415(5)(B).